**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSELITO TINEO, : | |
| : | Civil Action No. 10-1363 (FSH) |
| Petitioner, : | |
| : | |
| v. : | **O P I N I O N** |
| : | |
| LARRY GLOVER, et al., : | |
| : | |
| Respondents. : | |

**APPEARANCES:**

Joselito Tineo, Pro Se
Northern State Prison
# 558593
168 Frontage Road
Newark, NJ 07114

Sara Beth Liebman
Union County Pros. Office
32 Rahway Avenue
Elizabeth, NJ 07202
Attorney for Respondents

**HOCHBERG, District Judge**

Petitioner, Joselito Tineo, submitted this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, and Respondents, Larry Glover and the Attorney General of New Jersey, have submitted an answer to the petition (docket entry 15). For the following reasons, the petition will be denied.

**BACKGROUND**

**A.   Factual Background**

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division"), in Petitioner's appeal.[1]

> A jury found defendant guilty of three offenses: first degree aggravated sexual assault, second degree sexual assault, and second degree endangering the welfare of a child. The victim was the daughter of defendant's paramour. After her initial disclosures, the victim recanted. The trial judge allowed the State to call defendant's initially-retained attorney to explain the circumstances of a recorded interview with the victim at her home. We hold that the trial judge did not err in allowing the State to call defendant's initial attorney as a witness, and that a series of questions posed by the State to the victim, the initially-retained attorney, and the private investigator did not compromise the attorney-client privilege.
>
> Between 1998 and 2001, Anna lived in a series of apartments with her mother, her brother, and defendant. At times, defendant's father and two sons lived with them. When defendant's wife arrived from the Dominican Republic, defendant lived with her and their sons but maintained his romantic relationship with Anna's mother. During this period of time, Anna was between five and eleven years old.
>
> In mid-June 2003, Anna disclosed to her mother that defendant had sexually abused her over the course of two years. She informed her mother that defendant touched her, performed oral sex and had her perform

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

oral sex, and had her watch a pornographic movie. All of these acts occurred while her mother worked, her brother was visiting his father, and defendant was watching her in her mother's absence. Anna explained that she did not inform her mother earlier because defendant had told her that if she told her mother or anyone else, her mother would be incarcerated and she would not see her brother ever again. Anna was between nine and eleven years old when defendant sexually assaulted her.

   The day following the disclosure, Anna's mother took her to the prosecutor's office. Anna gave a statement, she received a medical examination, and the Division of Youth and Family Services (DYFS) commenced an investigation. Over the next six weeks, her home was in tumult. Her mother cried all of the time. She was overwhelmed by the realization that defendant had assaulted her daughter, that her daughter had been a sexual assault victim, and that she might lose custody of her daughter. At the end of July 2003, Anna told her mother that her accusation was false. At trial she testified that she just wanted to stop feeling anxious and to stop her mother's crying.

   Anna's mother called defendant the next day. He, in turn called his attorney and arranged for Anna and her mother to talk to his attorney. In August, defendant drove Anna and her mother to the office of his attorney, Rodrigo Sanchez. When they arrived, Sanchez had arranged for two attorneys with whom he shared space to speak to Anna. They did. Neither Sanchez nor defendant were present at this interview. Defendant drove Anna and her mother home after the interview.

   The attorneys advised Sanchez that Anna informed them that her accusations were not true. Neither attorney took notes of this interview nor made a videotape or tape recording of the interview. Therefore, Sanchez arranged for a private investigator to meet him at Anna's home to conduct an interview with the girl.

   On August 6 or 7, Sanchez arrived at Anna's home before Maria Palumbo, the private investigator. Initially, Sanchez waited for her on the porch but then entered the house. Anna's mother escorted him into a

living room where he sat with Anna and her mother while they awaited Palumbo's arrival. Sanchez admitted he was alone in the living room with Anna for a matter of minutes. According to Sanchez, he asked Anna's mother for a glass of water, she left the room and returned in minutes with the water. Anna testified that she was alone with Sanchez for almost an hour.

    According to Anna, Sanchez told her during this time that defendant would go to jail for twenty years and that defendant missed her, loved her, did not want to go away, and was sorry. The questions posed by the prosecutor and Anna's responses follow:

Q. And when he talked to you alone, did he tell you anything?

A. Yes.

Q. What did he tell you?

A. He told me-he ask me if I still love [defendant].

Q. What did you tell him?

A. I told him yes.

Q. Then what happened?

A. Then he told me that if I don't want to see him go away, to tell the prosecutor I was lying and that everything was just made up.

Q. Did he tell you what would happen to [defendant] if you said he touched you?

A. Yes.

Q. What did he tell you?

A. He told me that [defendant] would go to jail.

Q. Did he tell you for how long?

A. Yes, he told me for 20 years.

Q. Did he tell you anything else about [defendant] and how [defendant] felt about it?

4

A. Yes, he told me that he will miss me a lot, that he loved me, he don't want to go away.

Q. Did he tell you whether or not [defendant] was sorry?

A. Yes.

    At trial, the prosecutor posed a similar set of questions to Sanchez but he denied ever communicating any information to Anna. The questions posed by the prosecutor and Sanchez's responses are as follows:

Q. Now, your conversations that you had with the child, did you discuss with the child the defendant going to jail?

A. No, not at all.

Q. Did you discuss with the mother the defendant going to jail if the child said what he did to her?

A. Not at all.

Q. Did you discuss with the child the fact that the defendant was sorry and was crying?

A. Excuse me?

Q. Did you discuss with the child the fact that the defendant was sorry and was crying?

A. Not at all.

    Sanchez also testified the private investigator conducted the entire interview and that he posed no questions. He further testified he and the investigator left together and he did not return to Anna's house. Palumbo, however, testified that Sanchez participated in the interview, including posing questions to Anna. The investigator also testified that she and Sanchez left the house together but Sanchez returned to the house after they parted.

    After Anna recanted and provided the interview to Sanchez and the private investigator, her mother notified the prosecutor's detective. A second videotaped interview occurred. In this second interview

> with Detective Peter Klaskin, Anna withdrew her recantation and reiterated her initial accusations. During her summation, the prosecutor commented about the second videotaped interview with the detective as follows:
>
>> Yes, in the video [Anna] is a little, to use defense words, all over the place. It makes sense why. She just met with a man who was pappi's lawyer, that man told her that pappi is going to go to jail for 20 years, that man told her alone, without her mother present, that pappi is sorry for what he did, that he was crying, asked if you loved him.
>
> The jury found defendant guilty of first degree aggravated sexual assault; second degree sexual assault; and second degree endangering the welfare of a child. Prior to sentencing, defendant pled guilty to third degree witness tampering. Judge Triarsi merged Counts Two and Three with Count One and imposed a sixteen-year term of imprisonment subject to an 85% parole ineligibility term required by the No Early Release Act. Defendant is also subject to the terms of Megan's Law. The judge also imposed a consecutive three-year term of imprisonment for witness tampering.

See State v. Tineo, 2009 WL 2356445 AT **1-3 (N.J. App. Div. Aug. 3, 2009)(internal citations and quotations omitted).

**B.   Procedural Background**

After the sixteen-year sentence, with the 85% parole ineligibility period was imposed on August 4, 2006, Petitioner appealed.  On August 3, 2009, the Appellate Division affirmed the conviction.  On December 11, 2009, the New Jersey Supreme Court denied Petitioner's petition for certification.  It does not appear that Petitioner filed any petitions for post-conviction relief ("PCR") in the state courts.

6

Petitioner filed this habeas petition on March 15, 2010. On April 26, 2010, he filed an amended petition. Petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and Respondents were ordered to answer. Respondents filed an answer to the petition on or about May 25, 2011.

**C.     Petitioner's Claims**

Petitioner cites four grounds for relief (Amended Petition, docket entry 3, ¶ 12):

- (1) Excessive sentence- outside the guidelines for the crime in violation of the Eighth Amendment.

- (2) Violation of the Sixth Amendment- Attorney "broke attorney-client privilege."

- (3) Violation of due process- "both lower courts did not follow New Jersey Rules of Evidence."

- (4) Violation of New Jersey Rules of Evidence- "allowing testimony without weighing its prejudice manifestations."

(Am. Pet., ¶ 12). Petitioner states that these issues were raised on direct appeal. Although certain of Petitioner's claims do not appear to be exhausted, this Court finds that the claims are clearly meritless. Thus, the petition may be denied, despite failure to exhaust.[2]

---

[2] Although a petition for writ of habeas corpus may not be granted if Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding Petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

7

## 28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court

8

identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. See Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal case law, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any

9

supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierlev, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## DISCUSSION

**A.   Excessive Sentence Claim**

Petitioner argues that his sentence was excessive, "outside the guidelines for the crime in violation of the 8th Amendment." (Pet., ¶ 12).

The violation of a right created by state law is not cognizable as a basis for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))); see 28 U.S.C. § 2254(a) ("district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"). Accordingly, based on the supporting facts Petitioner alleges for this ground, which relate only to alleged violations of state law, Petitioner is not entitled to federal habeas relief.

To the extent Petitioner invokes the Eighth Amendment, this Court notes that a federal court's ability to review state sentences is limited to challenges based upon "proscribed federal

10

grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." See Grecco v. O'Lone, 661 F.Supp. 408, 415 (D.N.J. 1987) (citation omitted). Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation. See Pringle v. Ct. of Common Pleas, 744 F.2d 297, 300 (3d Cir. 1984); see also 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 67.

Here, Petitioner does not offer any proscribed federal grounds to challenge his sentence, and this claim must be denied.

**B. Privilege Claim**

In Ground Two, Petitioner argues that he is entitled to habeas relief due to a violation of the Sixth Amendment because his attorney broke the attorney-client privilege. (Pet., ¶ 12). Petitioner raised a similar claim before the Appellate Division on direct appeal. In rejecting the argument that the attorney-client privilege was violated, the Appellate Division held:

> Defendant also argues that it was "grossly improper" for the prosecutor to be allowed to question Sanchez about his discussion with Anna because the questions, particularly the question about defendant "being sorry," referred to communications between Sanchez and defendant, his client, and contained an admission of guilt. We disagree.
>
> A communication between an attorney and his client is privileged when the statement is made in conjunction with obtaining legal advice and with the expectation that it remain confidential. The rationale of the privilege is to promote free and full disclosure from the client to the attorney. The privilege does not attach to a communication meant to be shared with others.

11

> Defendant focuses on the "pappi is sorry" question. He argues that the question assumed a communication between defendant and his former attorney and an admission of guilt by him. However, the privilege has never been extended to statements made by a defendant to his attorney that were intended to be communicated to a third party. On its face, the question suggests a conversation between defendant and his attorney and the intention that information obtained during the conversation be transmitted to others.
>
> We have quoted extensively from the questions posed by the prosecutor to Anna and to Sanchez to allow any implied information contained in those questions to be considered in context. Clearly, there was more than a suggestion that defendant singly and through his former attorney tried to manipulate the young victim. If Sanchez participated in that manipulation, willingly or unwittingly, any discussion the former attorney and defendant had is not subject to the privilege. Moreover, the context demonstrates that any expression of remorse was intended to be communicated to Anna. As such, defendant cannot invoke the veil of confidentiality.
>
> We also reject the contention that this line of questioning was designed to disparage the former defense attorney and by implication defendant. Once Anna recanted and once the spectre of witness manipulation entered the case, the circumstances of the interview and the nature of any conversation between defendant's former attorney and Anna were clearly relevant. This is wholly different than the suggestion that a defense is disingenuous or that defense counsel is insincere or can be expected to dissemble because that is what you must expect from an attorney in an effort to fashion a defense. In short, considered in context and within the entirety of the record, the questions posed to Sanchez do not transgress the attorney-client privilege.

Tineo, supra, at **5-6 (internal citations omitted).

In order for the attorney-client privilege to attach to a communication, "it must be '(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.' " In re

12

Teleglobe Commc'ns Corp., 493 F.3d 345, 359 (3d Cir. 2007) (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000)). Under Federal law, the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).

Here, the communication at issue was between the Petitioner's former attorney and a witness. Thus, the privilege does not apply. See, e.g., Louisiana Mun. Police Emp'ees Retirement System v. Sealed Air Corp., 253 F.R.D. 300, 309 (D.N.J. 2008)("Generally, the voluntary disclosure of an attorney-client communication to a third party waives the attorney-client privilege.")(citing United States v. Rockwell Intern., 897 F.2d 1255, 1265 (3d Cir. 1990)).

Thus, Petitioner has not demonstrated that the state court's decision, that the attorney-client privilege did not extend to the communication at issue, was an unreasonable application of the facts or Supreme Court precedent, Petitioner is not entitled to habeas relief.

As far as Petitioner seeks to assert his claim as one of ineffective assistance of counsel (see Petition, docket entry 1, at 9(f), 12), he has not made a claim sufficient to warrant habeas relief. The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for

13

his defense." U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  As the Supreme Court explained,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from

14

> the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

Here, Petitioner has shown neither deficient performance, nor sufficient prejudice. His claim must be denied.

C. **Due Process Claims**

Petitioner argues in Ground Three that the lower courts violated the New Jersey Rules of Evidence, thereby violating his due process rights. In Ground Four, he states that the state courts did not properly weigh testimony. (Pet., ¶ 12). Petitioner raised the claim of improper introduction of evidence before the Appellate Division on direct appeal, and was rejected. See Tineo, supra, at **5-6.

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We

15

have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))). Accordingly, Petitioner cannot obtain relief even if an error had been made in a state law evidentiary ruling, unless the ruling rises to the level of a deprivation of due process. See id. at 70 ("'the Due Process Clause guarantees fundamental elements of fairness in a criminal trial'") (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967).

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. See Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001). Petitioner has made no such showing here. That the jury found him guilty does not render his trial unfair.

## CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

16

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. No certificate of appealability shall issue.

## **CONCLUSION**

For the reasons set forth above, the petition will be denied. An appropriate order follows.

s/ Faith S. Hochberg<br>
FAITH S. HOCHBERG<br>
United States District Judge

Dated: May 23, 2012